IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 JAN 31  A 11: 05

CLERK _____
SO. DIST. OF GA.

JASON TODD PRICE,            )
                            )
        Plaintiff,           )
                            )
    v.                      )        CV 112-059
                            )
DENNIS BROWN, Warden, Augusta )
State Medical Prison, et al.,  )
                            )
        Defendants.          )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, an inmate incarcerated at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia, commenced the above-captioned case pursuant to 42 U.S.C. § 1983, and is proceeding *pro se* and *in forma pauperis* ("IFP"). The case is presently before the Court on Defendants' motion for summary judgment. (Doc. no. 39.) Upon consideration of all facts and arguments presented by the parties in their respective briefs, and for the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED**, that a final judgment be **ENTERED** in favor of Defendants, and that this civil action be **CLOSED**.

## I.     FACTS[1]

Plaintiff's claims stem from an assault in his cell on December 26, 2011, during which he was stabbed and robbed by four inmates. (Doc. no. 20.) In December 2011, Defendant Barnish was a correctional officer and Defendant Brown was warden at ASMP. (Doc. no. 39, Ex. C ("Barnish Aff."), ¶ 2; Doc. no. 39, Ex. E ("Brown Aff."), ¶ 3). From December 9, 2011 through December 26, 2011, Plaintiff, who is serving a life sentence for murder, was housed at ASMP in Building 12, Dorm 12B-1. (Doc. no. 39, Ex. A ("Price Depo."), p. 47; Ex. B, p. 2.) Dorm 12B-1 is in the same building and on the same floor as Dorm 12B-2, and they are separated by a control room and sallyport. (Doc. no. 39, Ex. D-1; Barnish Aff. ¶ 8.) All doors in Building B-12 are electronically controlled from the control room. (Barnish Aff. ¶ 21.) Plaintiff claims Defendant Barnish was deliberately indifferent to his safety because he purportedly allowed the assailants access to Plaintiff's cell through the doors connecting Dorms 12B-1 and 12B-2 and through Plaintiff's cell door. (Doc. no. 20, pp. 5-7.) Plaintiff further claims that Warden Brown is subject to supervisory liability in connection with the same incident,

---

[1] Despite the Court's prior instructions (doc. no. 21, pp. 7-8), Plaintiff often fails to cite any evidence in support of his assertions in response to Defendants' motion and statement of material facts. (See generally doc. nos. 41, 42, 43.) Plaintiff claims that Defendants have withheld requested documents that would help him prove his case. (Doc. no. 43, pp. 1-2.) However, Defendants represent that nearly all of the disputed documents do not exist and therefore could not be produced. (Doc. no. 49-3.) Moreover, the proper avenue for Plaintiff to raise such a challenge would have been a motion to compel during the discovery period, which he did not file despite the Court's instructions. (Doc. no. 21, p. 7.) Therefore, where Plaintiff has failed to properly dispute a material fact in Defendants' statement, the Court has deemed that fact undisputed. See Fed. R. Civ. P. 56(e); Williams v. Slack, 438 F. App'x 848, 849 (11th Cir. 2011) (per curiam).

because he ignored the lax door-securing practices that purportedly allowed the assault to occur.[2] (Id.)

### A.    Plaintiff's Deposition Testimony

According to Plaintiff, Defendant Barnish was the only officer on duty in Dorms 12B-1 and 12B-2 on the day of the assault. (Price Depo., p. 10.) Plaintiff concedes that a second officer may have been on duty, but the only officer he saw was Defendant Barnish. Id. That day, individual cell doors in Dorms 12B-1 and 12B-2 were placed "on access" until lockdown, meaning that inmates could unlock their own cell doors from the inside to access the common areas in their assigned dorms. Id. at 30. Earlier that morning, Plaintiff observed that the sallyport doors separating the common areas of Dorms 12B-1 and 12B-2 were also open, allowing inmates access to both dorms and the yard. Id. at 41. Plaintiff states that officers on duty keep the sallyport doors open so they do not need to keep opening doors for inmates to go to and from the yard. Id. Plaintiff believes that Defendant Barnish opened the sallyport doors on December 26, 2011 because he was intimidated by inmates wanting to move more freely about the facility, but not to intentionally facilitate the attack on Plaintiff. Id. at 53-54.

Immediately before the assault, Plaintiff's cell door was locked because he was using the restroom. Id. at 11, 30. While Plaintiff was using the restroom, someone knocked on the door and asked to speak with him. Id. at 11. Plaintiff finished using the restroom, then went to open the door, at which point it opened on its own and four inmates entered his cell, assaulted him, and robbed him. Id. at 12. Plaintiff did not

---

[2] The Court dismissed all other claims asserted in the amended complaint at the screening stage pursuant to the IFP statute, 28 U.S.C. § 1915A. (See doc. nos. 22, 25.)

observe who opened his cell door, but claims he saw Defendant Barnish in the control room immediately after his cell door opened.[3] Id. at 10-12. Once Plaintiff's door was opened, the four inmates entered his cell, stabbed him in the face, and robbed him of personal property. Id. at 11-12, 32-34.

As to Warden Brown, Plaintiff claims the Warden was aware of "high violence at [ASMP] due to uncontrollable gang activity," that Dorm 12B-1 was "his worse [sic] dorm for violence," and that the Warden failed to correct these issues, resulting in Plaintiff being assaulted. (Doc. no. 20, p. 5.) According to Plaintiff, he was transferred to ASMP immediately after a riot occurred in Dorm 12B-1, and several fights occurred in this dorm during the seventeen days between his arrival at ASMP and the assault. (Price Depo., pp. 14-16.) Upon arriving at ASMP, other inmates told Plaintiff about the riots and fights, and warned Plaintiff about the inmates he claims assaulted him. Id. at 36.

Plaintiff states that, around the time of the assault, at least two violent incidents occurred each day at ASMP due to gang activity, but he had not personally observed any violent gang activity at ASMP either before or after his assault. Id. at 43-45. Plaintiff is aware of gang violence because of stories told by other inmates and because he suspected gang violence when he heard codes broadcast over the intercom and saw inmates brought into the medical unit on stretchers. Id. at 44-45. When pressed to identify the incidents of which he has actual personal knowledge, however, Plaintiff only identified a robbery in a cell near his cell, and an incident where he observed an inmate "come out bloody"

---

[3] However, in his opposition brief, which is not sworn testimony, Plaintiff claims he never said that Defendant Barnish opened his cell door electronically, and speculates that he may have manually opened the cell door from the floor. (Doc. no. 41, pp. 4, 6.)

from another cell. Id. at 60. Likewise, while Plaintiff believes that violence in his dorm was worse than elsewhere in the prison, his belief is based on information from other inmates, and he does not actually know how many violent incidents occurred in other dorms, or what the nature of those incidents were. Id. at 60. Plaintiff claims he knew of the violent reputations of the inmates he claims assaulted him, but he had not interacted with them prior to the assault. Id. at 44-45, 49.

Plaintiff claims that, prior to his assault, officers frequently left open the doors separating Dorms 12B-1 and 12B-2, and thus general population inmates from 12B-2 often commingled with inmates in Dorm 12B-1, even though he believes that prison regulations require inmates from the two dorms to be separated. Id. at 16-17, 34-35. Because of this commingling, inmates in 12B-1 were being robbed. Id. at 16-20. On approximately December 13, 2011, the inmates in Dorm 12B-1 informed Unit Manager McGrew of the improper commingling and robberies during a meeting. Id. at 19-20, 25-26. Ms. McGrew later reported to the inmates that the commingling would stop, and that Warden Brown told her he would take care of it. Id. at 26-27. When the commingling continued, the inmates again raised their concerns with Ms. McGrew on December 22nd. Id. at 21, 27-28. Plaintiff claims that Ms. McGrew again raised the inmates' concerns with Warden Brown on that same day, December 22, while in the yard. Id. at 27-28. He then conceded, however, that his belief was based solely on seeing Ms. McGrew speaking with Warden Brown in the yard, and that he had no knowledge concerning what they talked about. Id.

### B.     Defendants' Testimony

According to Defendants, the doors separating Dorms 12B-1 and 12B-2 remain locked unless they need to be opened to permit authorized individuals to enter or exit, and the control room officer generally opens all doors electronically to facilitate inmate movement.   (Barnish Aff. ¶¶ 18, 22; Doc. no. 39, Ex. D ("Harden Aff."), ¶ 14.) Nonetheless, inmates occasionally attempt to, and succeed at, gaining unauthorized access to a dorm to which they are not assigned.  (Harden Aff. ¶ 15; Ex. F ("Log Book"), p. 5.)   Inmates who attempt to gain unauthorized entry into another dorm are issued disciplinary reports.  (Harden Aff. ¶ 16.)

In December 2011, individual cell doors in Dorms 12B-1 and 12B-2 were placed "on access" until lockdown.  (Barnish Aff. ¶ 17; Harden Aff. ¶¶ 12, 13.)  At all times during this period, both a floor officer and a control room officer were assigned to Building 12B.  (Barnish Aff. ¶ 19.)  While the control room officer is required to remain at post in the control room, the floor officer walks the upper and lower floors of the building performing a variety of duties.  (Id. ¶¶ 22, 23.)

On December 26, 2011, Defendant Barnish and Officer Jones were assigned to Building 12B, with Defendant Barnish serving as the first shift floor officer.  (Id. ¶ 25; Log Book, p. 4.)  Defendant Barnish could not electronically open any doors in Building 12B, because he was walking the floor performing the various duties of the floor officer. (Barnish Aff. ¶¶ 26, 27, 32.)  Defendant Barnish responded to a banging noise coming from Plaintiff's cell, and immediately called for assistance upon observing that Plaintiff had suffered injuries to his face.  (Id. ¶¶ 28, 30.)  However, Defendant Barnish did not

witness the assault on Plaintiff, nor did he observe at that time any inmates in the vicinity of the cell other than Plaintiff's cellmate. (Id. ¶¶ 33, 34.)

At no time prior to the assault did Plaintiff indicate to Defendant Barnish, or any other ASMP staff member, that he feared gang violence in his dorm or that he would be attacked. (Barnish Aff. ¶¶ 37, 38; Brown Aff. ¶¶ 6, 9; doc. no. 39, Ex. H ("McGrew Aff."), ¶ 16.) Likewise, Plaintiff never indicated that he wished to be placed in protective custody or receive protection from any individual or inmate. (Barnish Aff. ¶ 39; Brown Aff. ¶¶ 7, 9; McGrew Aff. ¶ 17.)

Although Warden Brown was aware that inmates could be involved in gangs or resort to violence, he was unaware of any particular issue with gang activity in Building 12B in December 2011. (Brown Aff. ¶¶ 10, 11.) Warden Brown was likewise unaware of any especially high level of inmate-on-inmate assaults in Building 12B at that time. (Id. ¶ 12.) In fact, during the year 2011, there were approximately six inmate-on-inmate altercations in Dorm 12B-1, and Building 12B had a substantially lower number of such assaults than other buildings at ASMP.[4] (Id. ¶¶ 13, 14.)

Contrary to Plaintiff's assertions, Ms. McGrew states that she never participated in any meeting during which she was notified that inmates in 12B-1 were being assaulted by inmates in 12B-2, nor did she relay to Warden Brown any information concerning fears inmates in Dorm 12B-1 had of inmates in Dorm 12B-2 coming into their dorm.

---

[4] Plaintiff states in his response that Defendants have admitted that six violent incidents occurred in a one-month period in Dorm 12B-1. (Doc. no. 41, p. 5.) However, Plaintiff appears to have confused the dates in Defendants' statement of material facts, which states that six such incidents occurred during the one-year period from January 1, 2011 to December 31, 2011. (Doc. no. 39-2, p. 17.)

(McGrew Aff. ¶¶ 20, 21.) Moreover, during Warden Brown's tenure at ASMP, it was prison policy for inmates who were involved in assaults to be issued disciplinary reports if the allegations could be substantiated. (Brown Aff. ¶ 15.)

## II. DISCUSSION

### A. Summary Judgment Standard.

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Applicable substantive law identifies which facts are material in a given case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted). If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record

8

that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot meet its burden at trial is not sufficient. Id. at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**B.     The Merits of Plaintiff's Claims.**

In their motion for summary judgment, Defendants contend that (1) Plaintiff cannot establish a claim for deliberate indifference to his safety against either Defendant, (2) Warden Brown is not subject to supervisory liability, (3) Defendants are entitled to qualified immunity, (4) Plaintiff's claims for money damages against Defendants in their official capacities are barred by the Eleventh Amendment, and (5) Defendants cannot be

sued in their official capacities under § 1983. (See generally doc. no. 39-1.) As explained below, the Court agrees with Defendants on all of these points.

### 1. Plaintiff Cannot Establish a Deliberate Indifference Claim Against Defendant Barnish.

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal quotation marks omitted); see also Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984) (*per curiam*) ("Prisoners have a constitutional right to be protected from violence while in custody."). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834.

Rather, "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). To survive summary judgment, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant['s] deliberate indifference to that risk; and (3) causation." Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)). Plaintiff cannot prevail because the undisputed facts fail to satisfy elements two and three.

### a. The Undisputed Facts Show that Defendant Barnish Was Not Deliberately Indifferent to Plaintiff's Safety Because He Had No Knowledge of a Particularized Threat.

To satisfy the second element and prove that prison officials were deliberately indifferent, the plaintiff must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Goodman, 718 F.3d at 1331-32 (quoting Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010)). "Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983." Goodman, 718 F.3d at 1332 (quoting Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (*per curiam*)). Rather, a plaintiff must show that the defendant "subjectively knew of the substantial risk of serious harm and that [he] knowingly or recklessly disregarded that risk." Id. (internal quotation marks omitted) (quoting Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995)).

Before a prison official's failure to act can constitute deliberate indifference, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility." Brown, 894 F.2d at 1537. Moreover, "to be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." Goodman, 718 F.3d at 1332 (emphasis in original) (internal quotation marks omitted) (quoting Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1319-20 (11th Cir. 2005)).

With respect to a potential assault by other inmates, the prison-official defendants must be aware of a "particularized threat or fear felt" by the inmate in order to be subjectively aware of a substantial risk of serious harm. Carter, 352 F.3d at 1350; see also Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 618 (11th Cir. 2007) (issue of fact about whether assistant warden had subjective awareness when inmate told him twice "that his life had been threatened by members of his former gang and that, to avoid injury, he needed either to be transferred to another prison or to be placed in protective custody," and inmate submitted a "Request" form asserting that he feared for his safety and requesting a transfer).

With these principles in mind, and drawing all justifiable inferences in Plaintiff's favor based on the evidence in the record, the undisputed evidence shows that Plaintiff cannot establish deliberate indifference under these standards. Here, Plaintiff never expressed any fear of an assault, nor did he request protective custody or any other protection prior to the assault. (Barnish Aff. ¶¶ 37-39; Brown Aff. ¶¶ 6, 7, 9; McGrew Aff. ¶¶ 16-17.) Indeed, Plaintiff concedes he had no knowledge of the threat himself, and thus could not have put Defendant Barnish on notice of any threat, stating "how can you ask for protective custody before plaintiff even was assaulted, plaintiff cannot see into the future." (Doc. no. 41, p. 2.) Plaintiff's assertion is true for Defendant Barnish as well. As such, Defendant Barnish was not aware of a particularized threat or risk with a strong likelihood of occurring. Carter, 352 F.3d at 1350; Brown, 894 F.2d at 1537.

Plaintiff argues that Defendant Barnish had knowledge of a substantial risk because he "was fully aware of trouble of inmates prior to incident of robbing, stabbing

of inmates from other dorms [sic]." (Doc. no. 42, p. 3.) However, Plaintiff merely asserts that Defendant Barnish should have known of a substantial risk in light of these alleged incidents, but this does not establish deliberate indifference. Goodman, 718 F.3d at 1334 (citing Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as [a constitutional violation]."); Franklin v. Curry, No. 13-10129, 2013 WL 6728101, at *3 (11th Cir. 2013) ("[Plaintiff's] allegations that the Supervisory Defendants "knew or should have known" of a substantial risk clearly fall short of [the] standard."). In the prison context, simple awareness of inmates' problematic nature or proclivity to violence is not sufficient to establish that Defendant Barnish knew of a particularized threat and excessive risk of serious harm to Plaintiff. Carter, 352 F.3d at 1349-50 ("[B]efore [an official's] awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the aggressor inmates'] generally problematic nature.") Thus, Plaintiff has failed to show that Defendant Barnish had subjective knowledge of a risk of serious harm.

> **b.    The Undisputed Facts Show that Defendant Barnish Did Not Disregard a Risk of Harm By Conduct that Was More than Gross Negligence.**

Even if Defendant Barnish was aware of a substantial risk, Plaintiff fails to show that he knowingly or recklessly disregarded such risk. The only evidence of Defendant Barnish disregarding any risk is Plaintiff's speculation that Barnish opened the sallyport doors between Dorms 12B-1 and 12B-2, thereby allowing the attackers to enter Plaintiff's dorm, and his speculation that Barnish also opened the door to Plaintiff's cell

13

for the attackers. (Price Depo., p. 9.) Such speculation regarding the sallyport doors is wholly insufficient to create a factual dispute in light of Defendant Barnish's unequivocal testimony that he was the floor officer that day and did not control the sallyport doors that day, much less open them for the assailants. (Barnish Aff. ¶¶ 25-27, 32.) Furthermore, even if one assumed that Defendant Barnish did open the sallyport doors and allowed the attackers access to Dorm 12B-1, Plaintiff testified that he does not believe Defendant Barnish opened the doors between the dorms with the intent to allow the inmates to assault him. Id. at 53-54. Instead, Plaintiff contends that Defendant Barnish was intimidated by inmates wanting to move more freely about the facility and opened the doors in order to avoid conflict with them. Id. Such a deviation from policy amounts to no more than gross negligence, and absent the requisite knowledge of substantial risk fails to establish deliberate indifference. Goodman, 718 F.3d at 1333-34.

As to Plaintiff's cell door, Defendant Barnish testified that he did not and could not open it at the time of the attack. (Barnish Aff. ¶ 32.) Plaintiff did not see who opened his door, and merely speculates it was Defendant Barnish because he is the only officer Plaintiff saw that day. (Price Depo., pp. 9-10.) Plaintiff has also provided inconsistent statements as to how he believes Defendant Barnish opened the door, stating at his deposition that he saw Defendant Barnish in the control room, but later that Defendant Barnish may have opened the door manually. (Id. at 12; Doc. no. 41, pp. 4, 6.) Because Plaintiff is merely speculating by asserting that Barnish opened the cell door, Defendant Barnish's testimony that he did not do so is undisputed.

### c. Plaintiff Cannot Establish the Causation Element of a Deliberate Indifference Claim Against Defendant Barnish.

Even if Plaintiff had evidence that Defendant Barnish opened his cell door for the attackers, Plaintiff would still have no claim because there is no causation. Plaintiff concedes that, immediately after finishing his restroom break, he intended to and was preparing to open his cell door himself when it opened on its own. (Price Depo., p. 12.) Indeed, Plaintiff testified as follows:

> Q.  When someone knocked on your door and said I need to holler at you is that—
> A.  Yeah, speak to you but he—
> Q.  Speak to you, okay.
> A.  --said holler.
> Q.  So did you know if that was an inmate or an officer?
> A.  I'm assuming it was a inmate at the time because I didn't recognize the voice. Usually the officer, boom, boom, boom, hey, I need to see you or whatever, because, you know, you put your little thing up so nobody can watch you use the restroom.
> Q.  Okay.
> A.  So all I heard was a name – I mean a voice I didn't recognize.
> Q.  All right.
> A.  So I said I'll be there in a second. So I got up. I buttoned my pants. I go to open my door and my door pops on its own . . . .

Id. at 11-12. Thus, even if Plaintiff's allegation that Barnish opened the cell door for the attackers is true, there is no causal connection between Defendant Barnish opening the cell door and the assault since Plaintiff concedes that he was in the process of opening his cell door anyway. Goodman, 718 F.3d at 1331.

In sum, Plaintiff cannot establish that Defendant Barnish was subjectively aware of a substantial risk of serious harm, that he knowingly or recklessly disregarded any such risk, or that a causal connection exists between Defendant Barnish's conduct and

Plaintiff's injuries. <u>Goodman</u>, 718 F.3d at 1331-32; <u>Carter</u>, 352 F.3d at 1350. Therefore, Defendants' motion for summary judgment should be granted as to Plaintiff's deliberate indifference claim. <u>Clark</u>, 929 F.2d at 608.

### 2. Plaintiff Does Not Have a Viable Supervisory Liability Claim Because There Is No Causal Connection Between Warden Brown and the Alleged Constitutional Violation.

Even if Plaintiff could establish a claim for deliberate indifference to his safety against Defendant Barnish, which he cannot for the reasons stated above, Plaintiff still cannot establish a supervisory liability claim against Warden Brown. Supervisory officials such as Warden Brown "are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." <u>Hartley v. Parnell</u>, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted). Rather, in order to impose liability on a supervisory official, a plaintiff must demonstrate that either (1) the supervisor actually participated in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. <u>Hartley</u>, 193 F.3d at 1269 (citing <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990)).

"The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," <u>Brown</u>, 906 F.2d at 671, or when "the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" <u>Hartley</u>, 193 F.3d at 1269 (quoting <u>Rivas v. Freeman</u>, 940 F.2d 1491, 1495 (11th Cir. 1991)). A causal connection may also be shown when the facts support "an inference

that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone, 326 F.3d at 1360 (quoting Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003)).

"The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Cottone, 326 F.3d at 1360-61 (quoting Gonzalez, 325 F.3d at 1234). Isolated incidents are generally not sufficient to establish a supervisor's liability; rather, the deprivations must be "obvious, flagrant, rampant, and of continued duration." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting Hartley, 193 F.3d at 1269). Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1542 (11th Cir. 1994).

With these principles in mind, and drawing all justifiable inferences in Plaintiff's favor based on the evidence in the record, the Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether Warden Brown is liable in his capacity as a supervisory official. First, there is no evidence to suggest that Warden Brown personally participated in the alleged constitutional violation. Carter, 352 F.3d at 1350; see Brown Aff. ¶¶ 6, 7, 9, 11, 12. Like Defendant Barnish, Warden Brown had no knowledge of any particularized threat of assault, and Plaintiff's allegation that Warden Brown should have known of such a risk because he had a general awareness of violence and gang activity does not establish the requisite knowledge. Goodman, 718 F.3d at 1334; Franklin, 2013 WL 6698070, at *3. There is also no evidence that Warden Brown

directed his subordinates to act unlawfully or knew that they would act unlawfully and failed to stop them. Cottone, 326 F.3d at 1360.

Second, there is no evidence that Warden Brown caused the assault by adopting improper customs or policies. On the contrary, Warden Brown adopted customs and policies to prevent assaults, not facilitate them. The undisputed evidence shows that inmate assaults and attempts to enter other dorms without authorization were subject to disciplinary procedures under prison policy. (Brown Aff. ¶ 15; Harden Aff. ¶ 16.) Furthermore, prison custom and policy required that the doors separating Dorms 12B-1 and 12B-2 remain locked except to allow authorized individuals to pass through. (Harden Aff. ¶ 14; Barnish Aff. ¶ 18.) As such, Warden Brown did not establish any custom or policy resulting in deliberate indifference to Plaintiff's safety. Hartley, 193 F.3d at 1269.

Third, Warden Brown did not direct his subordinates act unlawfully, nor did he know that they would act unlawfully but failed to stop them from doing so. Plaintiff claims officers often left the doors separating Dorms 12B-1 and 12B-2 open, allowing inmates access to the adjacent dorm, and that Ms. McGrew notified Warden Brown of this practice and the resulting fear in 12B-1 of assaults and robberies by inmates in 12B-2. (Price Depo., pp. 26-28, 34-35.) However, Plaintiff has not provided any evidence that Warden Brown directed his officers to leave the doors open, or that he knew they would do so. Cottone, 326 F.3d at 1360.

Indeed, Plaintiff's own testimony indicates that when Warden Brown allegedly learned from Ms. McGrew that prison policy was being violated, he did not condone such

behavior but rather informed Ms. McGrew that it was to stop. (Price Depo., pp. 26-28.) Such notice did not amount to knowledge of obvious, flagrant, or rampant constitutional violations, and the fact that Warden Brown's subordinates at times failed to execute prison policy as to inmate movement between dorms is insufficient to meet the "extremely rigorous standard for supervisory liability." Gray, 458 F.3d at 1308; Brown, 906 F.2d at 671; see Goodman, 718 F.3d at 1335-36 (policy violations of prison officials failed to create a genuine issue of fact as to the existence of a custom so settled and permanent as to have the force of law for the purpose of establishing a causal connection for supervisory liability).

Fourth, Plaintiff has failed to show a history of widespread violence that would have put Warden Brown on notice of the need to correct the alleged deprivation. Prison records document only six inmate-on-inmate altercations in 12B-1 during all of 2011, and Building 12B actually had fewer violent incidents than other dorms at ASMP. (Brown Aff. ¶¶ 13, 14.) Because violence in Plaintiff's dorm was not obvious, flagrant, rampant, or of continued duration, it did not amount to a history of widespread abuse. Gray, 458 F.3d at 1308; Brown, 906 F.2d at 671. Plaintiff testified that at least two violent incidents were occurring each day at ASMP in December 2011. (Price Depo., pp. 43-44.) However, when pressed, he revealed that he had personal knowledge only of his own assault, as well as of two robberies. Id. at 44, 60. Plaintiff believes that other violent incidents occurred in his dorm, but conceded that this belief is founded upon his speculation after hearing codes over the intercom and seeing inmates on stretchers. Id. at 45. Plaintiff conceded that he knows nothing about the nature of these incidents, such as

why the inmate needed medical attention, whether the inmate was injured in a fight, and if so whether the fight occurred with inmates from Dorm 12B-1 or 12B-2. Id. at 36, 45, 60. Plaintiff further admitted during deposition that he had no personal knowledge of whether his dorm had more violent incidents than others at ASMP, and that he based his belief that it was more dangerous on the mere fact that other inmates said it was. Id. at 60. Plaintiff's speculation and unfounded beliefs are woefully inadequate to create a genuine issue of fact concerning whether a history of widespread violence put Warden Brown on notice of the need to correct a constitutional deprivation.

### 3.    Defendants Are Entitled to Qualified Immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Gilmore v. Hodges, No. 11-12674, 2013 WL 6698070, at *5 (11th Cir. 2013). "[Q]ualified immunity protects all but the plainly incompetent or one who is knowingly violating the federal law." Gilmore, 2013 WL 6698070, at *10 (internal quotation marks omitted) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). If the defendants show that they were acting within their discretionary authority, "the burden shifts to the plaintiff to satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant[s'] alleged misconduct." Gilmore, 2013 WL 6698070, at *5 (citing Pearson, 555 U.S. at 232). For

an official's acts to be within his or her discretionary authority, they must be "(1) undertaken pursuant to the performance of [their] duties and (2) within the scope of [their] authority." Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (*per curiam*) (punctuation omitted) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)).

Here, Defendants have satisfied the threshold requirement of showing they were acting within the scope of their discretionary authority, as Defendant Barnish was on duty during the assault, and Warden Brown was warden of ASMP during the relevant time period. See Lenz, 51 F.3d at 1545. Accordingly, the Court must determine whether Plaintiff has established the violation of a constitutional right which was clearly established at the time of the violation. Gilmore, 2013 WL 6698070, at *5.

"A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005) (internal citations omitted). "A constitutional violation may be clearly established either by similar prior precedent, or in rare cases of "obvious clarity." With either method, the touchstone is whether the right would be apparent to a reasonable officer." Gilmore, 2013 WL 6698070, at *10. "If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).

### a. The Right at Issue was Not Clearly Established by Similar Prior Precedent.

Under the first approach, the Court looks only to "binding precedent—holdings of cases drawn from the United States Supreme Court, [the Eleventh Circuit], or the highest court of the state where the events took place." Id. (citing Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009)). "The qualified immunity inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. An official's awareness of an abstract right does not equate to knowledge that his conduct may infringe that right." Id. at *10 (internal quotations and citations omitted) (quoting Coffin, 642 F.3d at 1013, 1015). Moreover, "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Id. at *11 (quoting Coffin, 642 F.3d at 1015). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." Id. at *10 (quoting Coffin, 642 F.3d at 1013).

As stated above, Plaintiff has failed to show violation of a constitutional right by deliberate indifference, and Defendants are entitled to qualified immunity on this basis alone. See supra Part II.B.1 & 2. Even if Plaintiff had shown that Defendants were deliberately indifferent to his safety, they are entitled to qualified immunity in this case because the right at issue was not clearly established by case law related to leaving prison doors open and thereby allowing inmates to commit assaults and robberies on inmates in neighboring dorms.

Plaintiff has not shown, and the Court is not aware of, any case in the United States Supreme Court, Eleventh Circuit Court of Appeals, or Supreme Court of Georgia in which a court has determined conduct to be unconstitutional in these factual circumstances of violent inmates from one dorm purportedly taking advantage of free access between dorms to commit assaults and robberies. Furthermore, cases involving inmate attacks indicate that Defendants' conduct was not clearly established as unconstitutional. In Carter v. Galloway, the Eleventh Circuit held that prison officials were not liable despite their knowledge that the victim's cellmate was a "problem inmate" who was "prone to violence," and the plaintiff's notice to them that his cellmate "acted crazy." 352 F.3d at 1349. In McBride v. Rivers, the Eleventh Circuit granted summary judgment for the defendant prison officials, even though the plaintiff notified them that he and his cellmate "had problems" and that he was "in fear for [his] life." 170 F. App'x 648, 652 (11th Cir. 2006) (*per curiam*). Furthermore, in Staley v. Owens, the Eleventh Circuit affirmed summary judgment for the defendant warden, even though the plaintiff had discussed the problems of assaults and thefts with the warden prior to his assault by another inmate. 367 F. App'x 102, 108 (11th Cir. 2010) (*per curiam*).

Here, it is undisputed that Defendants had no knowledge of the particularized threat to Plaintiff, and at most only knew that inmate assaults had occurred previously in Dorm 12B-1. Therefore, any violation of Plaintiff's rights by Defendants' failure to protect him from the assault was not apparent such that Defendants had fair warning that their conduct was actionable, and they are entitled to qualified immunity. Bennett, 423 F.3d at 1255; Gilmore, 2013 WL 6698070, at *10.

23

### b. The Right at Issue was Not Clearly Established with Obvious Clarity.

For a constitutional violation to be established with obvious clarity, the conduct must "so obviously violate[] the constitution that prior case law is unnecessary." Gilmore, 2013 WL 6698070, at *11 (quoting Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir.2005)). "Obvious clarity cases are rare, and present a narrow exception to the general rule of qualified immunity." Id. (internal quotations and citations omitted) (quoting Coffin, 642 F.3d at 1015; Lee, 284 F.3d at 1199). "[A] broad statement of legal principle announced in case law may be sufficient if it establishes the law with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted. Alternatively, obvious clarity is recognized if the conduct is so bad that case law is not needed to establish that the conduct cannot be lawful." Id. (internal quotations and citations omitted) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002)).

The obvious clarity exception does not apply here, because Defendants' conduct was not so egregious that prior case law was not necessary to put them on notice of its unconstitutionality. The Eleventh Circuit recently held that "depraved, inhuman treatment" is needed for the obvious clarity exception to apply. Gilmore, 2013 WL 6698070, at *12. As an example, the Eleventh Circuit cited Lee, where qualified immunity was denied to a police officer "because the officer's "plainly excessive" and "wholly unnecessary" conduct—taking a fully secured and handcuffed arrestee to the

24

back of her car and then slamming her head against the trunk—was "objectively unreasonable and clearly unlawful." Id. (quoting Lee, 284 F.3d at 1198, 1200); see also Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (even without preexisting case law directly on point, an officer was not entitled to qualified immunity where he ordered and allowed his dog to attack and bite the fully subdued plaintiff for at least two minutes and threatened to kill the plaintiff when the plaintiff kicked his dog in an effort to resist the unprovoked attack). Here, Defendants' failure to protect Plaintiff from being assaulted by an inmate in another dorm comes nowhere near to the sort of conduct cited by the Eleventh Circuit as meeting the obvious clarity exception.

In short, even assuming Defendants' conduct was actionable, existing law in effect at the time of the events giving rise to this action did not make it apparent that Defendants' conduct would violate an inmate's constitutional rights, and their conduct was not nearly so egregious that case law was unnecessary to put them on notice that it was unlawful. Therefore, Defendants are also entitled to summary judgment based on qualified immunity even if Plaintiff did establish a constitutional violation.

**4.     Plaintiff's Claims Against Defendants in Their Official Capacities Are Barred.**

The Eleventh Amendment bars official capacity claims against state prison officials for money damages. Kentucky v. Graham, 473 U.S. 159, 169 (1985).

Therefore, to the extent Plaintiff seeks damages from Defendants in their official capacities, such claims fail as a matter of law.[5]

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS AND RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** (doc. no. 39), that a final judgment be **ENTERED** in favor of Defendants, and that this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 31st day of January, 2014, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE

---

[5]Apart from their Eleventh Amendment argument, Defendants assert that Plaintiff's claims should be dismissed because Defendants are not "person[s]" within the meaning of § 1983 when sued in their official capacity. (Doc. no. 39-1, pp. 24-25.) However, this assertion is more properly treated as a part of Defendants' Eleventh Amendment argument than as a separate argument for dismissal. In Will v. Michigan Dept. of State Police, the Supreme Court reasoned that the Eleventh Amendment barred § 1983 actions against state officials sued in their official capacities for monetary damages because such actions are tantamount to actions against States, which are not "persons" under § 1983. 491 U.S. 58, 71 (1989). Thus, the fact that a state official sued in his official capacity for monetary damages does not qualify as a "person" is not a separate basis for dismissal, but rather is the rationale behind the Eleventh Amendment bar. See id.